IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 3, 2017

## IN RE ALYSSA W., ET AL.[1]

**Appeal from the Circuit Court for Bradley County**
**No. V-16-138          J. Michael Sharp, Judge**

_____

**No. E2017-00070-COA-R3-PT**

_____

The Department of Children's Services initiated a proceeding to have four children declared dependent and neglected; the children were so determined, and in a separate proceeding, the Department sought to terminate the rights of the parents of the children. The rights of the father of three of the children were terminated on the grounds of substantial noncompliance with the permanency plans, persistence of conditions, and severe child abuse; the court also determined that termination was in the children's best interest. After a thorough review of the record, we reverse the ground of persistence of conditions and affirm the remaining grounds and the holding that termination of Father's rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Berry Foster, Chattanooga, Tennessee, for the appellant, Edwin B.

Herbert H. Slattery, III, Attorney General and Reporter; Ellison M. Berryhill, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

## I.   BACKGROUND AND PROCEDURAL HISTORY

This is an appeal from the termination of Edwin B.'s ("Father") rights to three children: Dylan B., born in September 2009, Sophia B., born in March 2014, and Edwin B., Jr., born in June 2015. These children all have the same mother, April W. ("Mother"). A fourth child, Alyssa W., was born to Mother and John W. in July 2008; Alyssa lived with Father prior to the events giving rise to this appeal.

The Department of Children's Services ("DCS" or "the Department") initially became involved with the family in April of 2013 when the children's maternal grandmother filed a petition for emergency custody of them in Knox County Juvenile Court. The record is unclear about the circumstances that led her to file the petition, but it appears that Alyssa and Dylan were removed from Father's home and placed in DCS custody at that time. On July 25, 2013, Father filed a petition for custody; that petition, along with others filed by various interested parties, was heard on November 12, 2013. On February 21, 2014, a magistrate entered an order, *nunc pro tunc* to November 12, 2013, holding that Father would retain legal and physical custody of both children; that the maternal grandmother would have the authority to consent to their medical and educational matters and continuing responsibility to provide for their care and supervision; and that Mother was allowed visitation supervised by the maternal grandmother on various days and times, not to exceed twelve hours per week, was prohibited from spending the night at any place where the children were staying, and was to complete an intensive outpatient program in which she was enrolled.

DCS became involved again on January 28, 2015, after the Department received a referral of a drug exposed child. Following interviews with Alyssa and Dylan where they described seeing Mother use "a rig" or give herself "a shot" in the arm, the Department initiated a dependent and neglect proceeding in Bradley County, where Father and the children had moved.[2] The children were subsequently removed from the home, and permanency plans were developed on March 9, 2015 and June 3, 2015,[3] for Alyssa,

---

[2] An order was entered in the Knox County proceeding on March 23, 2015, relinquishing and transferring jurisdiction to Bradley County for further proceedings.

[3] The record does not contain a copy of the March 2015 permanency plan. Cassandra Leonor, the DCS family services worker, testified that the June 2015 permanency plan in the record is the plan that was originally created in March 2015 and that the Department's computer system changes the date of the plan whenever the plan is opened on the computer. Included as part of the June 2015 plan is a page entitled "Agreements" and a page listing the persons who participated in the meeting wherein the plan was developed; these pages reflect that Father (and other parties) participated in the creation of the plan and signed it in March 2015. The record also contains Exhibit 5, entitled "Parents' Statement of Responsibilities Under Permanency Plan Dated 03-09-2015," which was signed by Father on March 9, 2015. It lists eight items that pertain to Father, along with a handwritten notation about "Spanish

Dylan, and Sophia. In June 2015, shortly after his birth, the Department received a referral that Edwin Jr., had tested positive for amphetamines and methamphetamine, and he was placed in DCS custody; another permanency plan was created in January 2016.

An adjudicatory hearing was held on four different days, and the children were adjudicated dependent and neglected and held to be the victims of severe child abuse on March 16, 2016. Both Mother and Father timely appealed that decision to the circuit court.

On July 21, 2016, DCS filed a petition to terminate the rights of Mother and Father to Dylan, Sophia, and Edwin, Jr., as well as the rights of Mother and John W. to Alyssa. With respect to Father, the petition alleged the following grounds for termination: abandonment by failure to provide a suitable home (Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(ii)); abandonment by failure to support (Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i)); substantial noncompliance with the permanency plan (Tennessee Code Annotated section 36-1-113(g)(2)); persistence of conditions (Tennessee Code Annotated section 36-1-113(g)(3)); and severe child abuse (Tennessee Code Annotated section 36-1-113(g)(4)). The petition also alleged that termination was in the best interest of the children. An amended petition was filed on July 25, 2016.[4]

The *de novo* adjudicatory hearing on the dependent and neglect petition was consolidated for hearing with the termination petition by agreement of the parties; the hearing took place on August 29, 2016. The following witnesses were called: Child Protective Services Investigator Brittany Olenick-Bordes, Father's sister-in-law Kimberly B., DCS family service worker Cassandra Leonor, case manager and visitation supervisor Erica Holmes of the Chambliss Center for Children, Omega Laboratories Positive Certifying Scientist and Confirmation Supervisor Patrick Minno, Mother, Mother's boyfriend Mark M., Father, and the children's foster mother. Following the hearing, the court entered an order adjudicating the children to be dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(12)(G) and finding them to be victims of severe abuse pursuant to section 37-1-102(b)(21)(A)(ii). With respect to the termination petition, the court made numerous factual findings and concluded that the evidence did not support termination of Father's rights on the grounds of abandonment by failure to provide a suitable home or by failing to support the children, but that it did clearly and convincingly support the grounds of substantial noncompliance with the permanency plans and severe child abuse as to Dylan, Sophia, and Edwin Jr., and

---

classes"; it is not clear from the exhibit as to which parent this item pertains, however, Ms. Leonor testified that Father "didn't go to Spanish, English classes like we asked."

[4] There is no discernable difference between the two petitions, except for the addition of a certificate of service on the amended petition.

3

persistence of conditions as to Dylan. The court also determined that termination of Father's rights was in the children's best interest.[5]

Father appeals the termination of his rights, contending that there is not clear and convincing evidence in support of any of the grounds or that termination is in the best interest of the children.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated under certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be

---

[5] The court also terminated Mother's rights to the four children and John W.'s rights to Alyssa; Mother's and John W.'s rights are not at issue in this appeal.

established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. DISCUSSION

### A. Substantial Non-Compliance with the Permanency Plan

In the dependent and neglect proceeding two permanency plans were developed, both of which were ratified by the court on February 4, 2016. The June 2015 plan applied to Alyssa, Dylan, and Sofia and had as goals "return to parent" and "adoption." The plan listed three desired outcomes, each of which placed specific responsibilities on Father: (1) that "[t]he children will reside in a drug free living environment," which required Father to abide by all court orders, including supervision of the children as outlined by the court or the department and to "not be around those that use or abuse illegal substances"; (2) that a stable home environment would be provided for the children, which required Father to provide proof of legal income, obtain and maintain residential stability for a minimum of six months, provide a copy of a rental or lease agreement in his own name, provide documentation of a current driver's license, proof of insurance, and vehicle registration or establish a transportation plan, maintain contact with the family service worker, and provide proof of utilities in his own name; and (3) that "Alyssa will continue her educational program," which placed on Father the responsibility to ensure that she attend school on a daily basis, turn in all assignments in a timely manner, follow all rules at school and on school property, and that he would participate in any educational meetings held for her.

The January 2016 plan, which Father signed only as participating in the meeting where the plan was developed, contained the same goals for the oldest three children; with respect to Edwin Jr, who had been born in the interim, the plan only contained the goal of "return to parent." Father's responsibilities under this plan were substantially the same as the previous plan, adding Dylan to the desired outcome of continuing educational programs which had previously only referenced Alyssa.

A court is authorized to terminate parental rights when there is "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). In order to justify the termination of parental rights, the parent's noncompliance must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). Technical noncompliance is not substantial and is not sufficient to justify the termination of parental rights. *Id.* Expounding upon this requirement, the court in *In re M.J.B.* stated,

> Terminating parental rights based on Tenn. Code Ann. §36-1-113(g)(2)
> requires more proof than that a parent has not complied with every jot and

tittle of the permanency plan. To succeed, the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, [No. M2002-02235-COA-R3-JV,] 2003 WL 21266854, at *12 [(Tenn. Ct. App. June 3, 2003)]. Trivial, minor, or technical deviations from the permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

140 S.W.3d at 656-57. Whether there has been substantial noncompliance with the requirements of the permanency plan is a question of law and is reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008), abrogated on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015) (citing *In re Valentine*, 79 S.W.3d at 546).

As to this ground, the trial court held:

. . . The Juvenile Court ratified the two permanency plans on February 4, 2016 as in the children's best interests and found that the requirements for the Respondents were reasonably related to the reasons for foster care.

***

The permanency plans require [Father] to accomplish the following tasks/responsibilities: not be around those who use or abuse illegal substances; submit to random drug screens by the department; abide by all court orders; participate in any educational meetings held for the children; provide documentation of a current driver's license, proof of insurance, vehicle registration or a transportation plan; provide the department with proof of legal income; obtain and maintain residential stability for a minimum of six months; provide the department with a copy of a rental/lease agreement in her [sic] own name; attend Spanish/English language classes on Saturdays; maintain contact with the family service worker and notify FSW of any change of circumstance within 24 hours; seek and gain employment and provide proof of employment; provide the department with proof of utilities in his own name.

6

\*\*\*

The Court finds by clear and convincing evidence that [Father] has not substantially complied with the requirements of the permanency plans. The Court finds in particular, that [Father] does not have a valid driver's license, and continues to drive in violation of the law without one. [Father] has not refrained from associating with [Mother], although she uses illegal drugs. [Father] testified that until recently [Mother] had a key to his home. Further, [Father] has attended visitations with [Mother], riding to and from visits together. In June of 2016, [Father] paid a cash bond for her. The Court finds that the utilities at [Father's] home are in [Mother's] name.

The Court also notes that in addition to having a fairly thin transportation plan (per [Father's] testimony, he would call a taxi), [Father] did not indicate who would provide childcare for the four children while he worked if they returned to his custody. The court finds [Father] has no real concern for [Mother's] illegal drug use, even to the point of continuing to leave his children alone with her in direct violation of valid court orders. The court does not believe this will change, given [Father]'s testimony and demeanor.

Father argues that the trial court did not make the necessary finding that the requirements of the permanency plan were reasonable and related to remedying the conditions which necessitate foster care placement. He also argues that he has complied with the permanency plan, except that he has not obtained a driver's license or completed the Spanish/English classes, and as to those requirements, DCS "has provided next to nothing with respect to services and/or offers to assist Father."

Where a trial court has not made a finding regarding the reasonableness of the requirements of a permanency plan, we review the issue *de novo*. *In re Valentine*, 79 S.W.3d at 547. The requirements that Father not be around people who were using illegal substances and that he comply with existing court orders addressed the plan's objectives to minimize the impact of Mother's drug use on the children and that her visitation with them be supervised. The requirements also addressed measures Father needed to take to ensure not only that the Alyssa and Dylan maintained consistency at school but also that safe, legal, and reliable transportation was available to them. Upon our review, we conclude that the requirements were reasonably related to remedying the conditions that caused the children to be removed from Father's custody and addressed the conditions which led to the dependent and neglect proceedings, particularly Mother's drug use and the overall lack of safety and stability afforded the children while living in the home. We proceed to address whether there is clear and convincing evidence that Father was not in substantial compliance with the plans.

7

Father's sister-in-law testified that Father, Mother, Dylan, and Alyssa resided with her for more than a month when the family moved to Bradley County and that Mother stayed at the home every night during this time. Ms. Leonor testified that Mother was present during a home study at Father's home that Ms. Leonor conducted, and it was clear that Mother was living in the home; that Mother's name appeared on Father's utility bills; that Father failed to obtain a valid driver's license, and that, despite the suggestion that he use a taxi as part of his transportation plan, Father never used this service to attend a visit. Ms. Leonor also testified that Father completed several of the requirements under the plans, i.e., he provided proof of income, proof of rental or lease in his own name, and did not use illegal substances; however, both Ms. Leonor and Father testified that Father failed to complete a number of critical tasks required under the plans.

The proof clearly showed that Father maintained a relationship with Mother despite the requirements of the permanency plans not to associate with those who use or abuse illegal substances; Mother testified that she has used drugs, specifically methamphetamine.[6] In addition, Father testified that he and Mother spoke on the phone regularly; that Mother had a key to his home as recently as three months prior to trial; that the two had been involved in an altercation in which Father chased Mother with a machete a few months prior to trial; and that he paid a cash bond for Mother in June of 2016. The Knox County order, compliance with which was a condition required in the permanency plan, required Father to allow Mother only supervised visitation and not to allow her overnight stays with the children. These requirements were of paramount concern to DCS and the trial court; not only did Father fail to separate himself from Mother, but allowed her to be around the children overnight and unsupervised violated the order and the permanency plans. The evidence clearly and convincingly shows Father's substantial noncompliance with the plans.

### B. Severe Child Abuse

Tennessee Code Annotated section 36-1-113(g)(4) provides that parental rights can be terminated when "the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, . . . by the court hearing the petition to terminate parental rights . . . against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian." A parent can be responsible for severe child abuse when the parent participates in the "knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death. . . . " Tenn. Code Ann. § 37-1-102(b)(22)(A)(i). "Knowing" is not explicitly defined in the statutes pertaining to child abuse or dependency and neglect;

---

[6] Mother testified that the last time she used drugs was "before [she] went to jail . . . last year [in 2015]" and that she had been out of jail since February of 2016. Ms. Leonor testified that Mother went to jail in September 2015. The trial court stated in the final order that the court "does not find great portions of [Mother]'s testimony to be credible, specifically concerning her use and purchase of drugs."

however, the "knowing" requirement is "not limited to parents who are present when severe abuse actually occurs." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004). Parents have an underlying "duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect." *In re H.L.F.*, 297 S.W.3d 223, 235 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, 2004 WL 1567122, at *6).

Relative to Father, the trial court ruled as follows regarding the ground of severe child abuse:

> The court finds, by clear and convincing evidence, that the children Alyssa W[.], Dylan B[.], Sophia B[.], and Edwin B[.] Jr. are victims of severe abuse pursuant to T.C.A. § 37-1-102(b)(21)(A)(ii).[7] The Court makes these findings as to the Mother, exposing these children to methamphetamine and other drugs, causing the two youngest children, Sophia B[.] and Edwin B[.] Jr., to ingest that dangerous controlled substance through direct contact and/or in utero exposure and exposing the children Alyssa and Dylan to the threat of exposure; and as to the Father knowingly failing to protect these children from said exposure and severe abuse.
>
> ***
>
> The Court finds that the State presented clear and convincing evidence, in conformity with *In re Mason E., et al.*, E2015-01256-COA-R3-JV, filed May 16, 2016, that the child Sophia was positive for methamphetamine pursuant to a hair follicle test conducted by Omega Laboratories.
>
> The Court notes that [Father], through counsel, repeatedly raised the point that [Father] was not present when the children stated that their mother, April W[.], was using drugs in front of them. However, "knowing" does not require that the parent is physically present when abuse or neglect occurs. The term "knowing" is not defined in T.C.A. § 37-1-102(b). However, the Court of Appeals referred in *In re S.J.*, 387 S.W.3d 576 (Tenn. App., 2012) to the case of *In re Caleb J.B.W.*, where the Court addressed the meaning of "knowing," finding that it "consider[s] a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

---

[7] The reference to this subsection is obviously a scrivener's error. It is apparent that the court intended to reference the definition of "severe child abuse" found in subsection 37-1-102(b)(22)(A)(i).

9

(*In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5, 2010 Tenn. App. LEXIS 447 (Tenn. Ct. App. July 14, 2010) (citing *In re R.C.P.*, 2004 Tenn. App. LEXIS 449, 2004 WL 1567122, at *7).

Only Alyssa and Dylan were subject to the protective supervision requirement of the Knox County Order; no proof was offered that either was positive for illegal drugs. However, as to Alyssa and Dylan, the Court finds that the mother's exposure of the children to drug abuse was to such an extent that the older children could describe drug paraphernalia in detail. Further, the children Alyssa and Dylan have reported to Ms. Olenick that they watched their mother use her "rig" or "shot" on more than one occasion, often describing times when they were left alone with [Mother] in violation of the Knox County order. The statute does not require that either of these children be actually harmed, but at risk of harm. [Mother] exposed Alyssa and Dylan to the same risk or threat of harm as Sophia and Edwin Jr., and [Father]'s failure to adhere to the Knox County Order contributed to the risk or threat of harm due to drug exposure.

The Court finds that, certainly given the Knox County order, [Father] knew, or acted in deliberate ignorance of, or in reckless disregard of the information presented to him. By his own testimony, [Father] acknowledged that [Mother] had keys to his residence. [Alyssa's father] testified that on numerous occasions, [Mother] traveled to visit him with the children Alyssa and Dylan after the November 2013 Knox County Order was entered. The Court finds it highly unlikely, given the statements of the children and other witnesses, that [Father] never allowed [Mother] to be alone with the children.

Although the Court finds that all four children are severely abused as regards [Father], the State would meet its burden even if the Court only found that the two older children Alyssa and Dylan were severely abused by [Father] for his failure to protect, per the statutory language . . .

Father asserts that "no clear and convincing evidence was presented to support a finding of severe child abuse." He argues that the proof of the children's exposure to Mother's drug use was inadmissible hearsay that should not have been considered by the court. Specifically, Father contends that the court erred in admitting the testimony of Ms. Olenick-Bordes and the children's foster mother as to what Alyssa and Dylan told them about Mother's drug use and Father's knowledge of it, as well as in admitting the results of a hair follicle test given to Sophia, which Father contends was inadmissible because the chain of custody was not established. He also argues that "the evidence that father knew of mother's drug use and allowed the children to be around mother while she was

allegedly using drugs is not clear and convincing." We shall address these matters separately.

## 1. Admissibility of Evidence

Ms. Olenick-Bordes testified that Alyssa told her that Mother used a "rig" in her presence, and that Dylan told her that Mother used a "rig" in his presence and that he had told Father about Mother's drug use. Foster Mother also testified that Alyssa and Dylan told her that they had been around Mother when she used drugs, that they had seen her put the needle in the arm, that they told Father abut Mother's drug use, that they had observed Father disposing of the needles, and that Alyssa stated that Father told her to "just put it [the needle] in the sink."

While Father references the testimony of Ms. Olenick-Bordes and Foster Mother in his brief, contrary to the requirement of Rule 27(g) of the Tennessee Rules of Appellate Procedure, he does not cite to the specific pages of the testimony which he asserts was improperly admitted or where he made an objection to the testimony. In its brief, the Department has identified the following ruling on a hearsay objection made by Mother's counsel during the testimony of Ms. Olenick-Bordes which raised the question of the admissibility of the testimony and which was resolved on the basis of Rule 803(25) of the Tennessee Rules of Evidence:[8]

> Q  What were those concerns?
> A  I had concerns about the mother using drugs around the children. Dylan
> had stated that he -- that his mother uses a rig. Described the rig as a shot.
>> THE COURT: His mother uses a...
>> THE WITNESS: Rig. R-I-G.
>> THE COURT: A rig?
>> THE WITNESS: Rig.
>> THE COURT: Okay.
> Q  (By [Department's counsel]) What is a rig, Brittany?
> A  He described the rig as a shot.
> Q  Did he call it a rig?
> A  Yes.
> Q  Is that a drug term?
> A  Yes. From my knowledge.
> * * *
> Q  (By [Department's counsel]) Did Dylan describe anything else to you?

---

[8] Upon our search of the transcript, this is the only objection which raised Tennessee Rule of Evidence 803(25).

A He did state that he and his sister are unsupervised around their mother and that he had told his father about the drug use -- or the use of the rig, the shot.

Q Did you have a chance to speak with Alyssa?

A Yes.

Q. Did you have concerns after speaking with Alyssa?

A. Yes. Alyssa also described the rig. She described it in a little more detail. She did call it a rig. She said that it was a shot that the mother puts in her arm. Prior to putting it in her arm she puts water in it and other stuff and then puts it in her arm. She said that her mother's arm will bleed after she puts the shot in her arm. Alyssa also described an incident -- I believe it was the previous night -- where her mom had gone to the grocery store with her in the van and once she got to the grocery store there was a phone call between her mother and Edwin and she was told to just come straight home. But she didn't, she met up with a man who got in the van.

[Mother's counsel]: I'm going to object to the hearsay. There are two levels of hearsay where the child said and then mom had some sort of phone call and somebody on the other end of the phone call said something and. . .

[Department's counsel]: I agree, Your Honor, that maybe what was said on the phone call isn't relevant but in terms of what the child -- this is the child saying what she observed and I believe what we're – this would be an 803(25) exception, Your Honor, as to child abuse.

[Guardian *ad litem*]: I agree with the Department, Your Honor. There is an exception to a child making representation of child abuse.

[Mother's counsel]: Your Honor, the exception they're referring to 803 Section 25 refers to statements of abuse or neglect made by the child. Observations about what mom did to some other person or what store she went to or something. Those are clearly hearsay. I didn't object based on relevance. I objected based on hearsay and they do meet that exception. If the child were testifying that momma did something to me, that would perhaps meet the exception but the child's observations about mother's day that evening do not.

[Department's counsel]: Well, actually, Your Honor, I don't think that's entirely true. The statement is a statement made for the -- the child's statement is that she was with her mother in violation of the Knox County order and statements that her mother was using drugs in her presence. So I think those statements are entirely relevant as to whether this child was abused or neglected at the hands of her mother.

THE COURT: All right. The objection is going to be overruled. Go ahead.

As an initial matter we address Father's failure to object to the testimony relating these statements or to what the Foster Mother relayed from the children, or to adopt the timely made objection made by Mother's counsel. Pursuant to Rule 103(a)(1) of the Tennessee Rules of Evidence, a party may generally not assign error to a ruling admitting evidence unless the party has made a timely objection. *See Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000) ("A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal" (citing Tenn. R. App. P. 36(a), cmt. a.)). In light of the fact that objection was timely made by Mother and the issue has been briefed by the parties, in our discretion we will proceed to consider this issue. *See* Tenn. R. App. P. 2.

Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion and will not be disturbed on appeal unless the trial court abused its discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, or employs reasoning that causes an injustice to the complaining party. *Banks*, 271 S.W.3d at 116 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). When we review the trial court's exercise of its discretion, we presume that the decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013) (citing *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

Rule 801(c) of the Tennessee Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted"; Rule 802 declares hearsay statements inadmissible. Pertinent to the issues in this case, Rule 803(25) states:

> Children's Statements. Provided that the circumstances indicate trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning issues of dependency and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12), issues concerning severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21)[9], or issues concerning termination of parental rights pursuant to Tenn. Code Ann. § 37-1-147 and Tenn. Code Ann. § 36-1-113 . . .

In his brief on appeal, Father does not adopt the argument made at trial by Mother's counsel; rather, he argues that circumstances do not indicate trustworthiness,

---

[9] The definition of "severe child abuse" is now found at Tennessee Code Annotated section 37-1-102(b)(22).

specifically that Foster Mother "wants to adopt the children and appears to be possibly motivating the children to say things which could help with adopting the children." In support of this argument, Father cites to Foster Mother's testimony acknowledging that she is a pre-adoptive home for the children and "want[s] to be considered if they become available." We fail to see, and Father does not cogently argue, how this testimony indicates a lack of trustworthiness of statements made by the children to the Foster Mother regarding their observations of Mother's drug use. Father does not argue or cite to any testimony given by Ms. Olenick-Bordes which he contends would make the children's statements untrustworthy.

We discern no abuse of discretion in the court's application of Rule 803(25). The children's statements related to issues concerning severe child abuse, as defined at Tennessee Code Annotated section 37-1-102(b)(22)(A)(i), and to the grounds supporting termination of Father's parental rights. There is no competent evidence that their statements are not trustworthy. The children described Mother's drug use consistently at different times to Ms. Olenick-Bordes and Foster Mother, and the specifics of the matters about which the children reported placed them in danger of serious bodily harm by their exposure to illicit drugs and drug paraphernalia; moreover, Father was aware of the threat to their safety inasmuch as they reported Mother's drug use to him. Thus, the testimony offered fit within the exception at Rule 803(25).

Father also argues that the results of drug screens performed on Sophia's hair follicle sample did not come within the hearsay exception at Rule 803(6) and should not have been admitted at trial.[10] Patrick Minno, an employee of Omega Labs, testified that tests performed on Mother and Sophia's hair follicle samples showed that they tested positive for certain drugs. In the course of his testimony, the court admitted the affidavit of David Engelhart, custodian of record for Omega Laboratories, where the drug tests on Sophia and Mother were performed.[11] Attached to the affidavit were the test results,

---

[10] Additionally, Father states in his brief that "the meconium test the youngest child allegedly failed was not entered into evidence." Ms. Olenick-Bordes testified, without objection, that Edwin Jr. was administered a drug test at his birth, which he failed; in the absence of a timely objection to this testimony or to the failure to introduce the test result into evidence, we will consider the testimony that Edwin Jr. failed the test to be uncontroverted.

[11] The affidavit stated in pertinent part:

> My name is David Engelhart. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:
>
> 1. I am a custodian of the records at Omega Laboratories, Inc., 400 N. Cleveland Avenue, Mogadore, OH. Attached hereto are 2 pages of records from Omega Laboratories, Inc. These said 2 pages of records are kept by Omega Laboratories, Inc. in the regular course of business, and it was the regular course of business of Omega Laboratories, Inc. for an employee or representative of Omega Laboratories, Inc., with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit

14

showing that Sophia tested positive for amphetamines and methamphetamines; also attached was a "Non-Federal Drug Testing Custody and Control Form," showing that a hair sample was collected from Sophia at the DCS Cleveland location by Meredith Freeman on March 12, 2015, and sent by Ms. Freeman to the lab at 2:35 p.m. on that date, where it was received by Logan Tiller, also on March 12. Mr. Minno, who was qualified as an expert in toxicology, testified, in part on the basis of the exhibit, as to Sophia's positive test result. In the course of Mr. Minno's testimony, Mother's counsel objected to the introduction of the affidavit and attachments on the basis of hearsay; Father's counsel stated that he would raise the same objection with respect to Sophia's test results. The objection was overruled.

Father asserts that this evidence "cannot meet the business records exception to hearsay" because the affidavits of the custodian of records for the laboratory was prepared well after the collection of samples in March of 2015 and only for the purpose of litigation; because no one from the collection site testified at trial; and because Mr. Minno admitted "that he had nothing to do with these samples, knew nothing of the collection site's procedures or whether they had been followed, and noted that he would have included some kind of photo in the documentation especially in the case of a child who does not have a photo I.D."[12] Father asserts that under these circumstances, the affidavits cannot meet the business records exception at Rule 803(6) of the Tennessee Rules of Evidence[13] and are therefore inadmissible.

---

information thereof to be included in such record; and the record was made at/near the time or reasonably soon thereafter. The records attached hereto are the originals or exact duplicates of the originals.

2. Omega Laboratories, Inc. received a hair specimen from Physician Services Drug & Alcohol Testing, Inc. on March 16, 2015 (Donor: Sofia B[.], Specimen ID#: [ ]). The specimen arrived at the laboratory with the specimen seal intact. The testing of the specimen was performed in accordance with all of Omega Laboratories, Inc. Standard Operating Procedures.

3. The results of the laboratory analysis were certified and reported on March 18, 2016.

[12] The court sustained the Department's objection to a line of questioning Mother's counsel asked Mr. Minno about the collection process used with respect to Sophia's sample on the basis that the question called for speculation. Father does not assert error with respect to this ruling on appeal.

[13] That rule reads:

Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as

15

We respectfully disagree with Father's argument. Mr. Engelhart's affidavit was not a part of the test or report; rather, it was an affidavit of the custodian of those records as contemplated by Rule 902(11) of the Tennessee Rule of Evidence.[14] The fact that it was prepared to allow the records to be introduced at trial is clearly contemplated by Rule 803(6).

Although not raising a specific issue in this regard, Father also questions the chain of custody of the hair samples. Whether the chain of custody has been established is "a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof." *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996) (quoting *Ritter v. State*, 462 S.W.2d 247 (Tenn. Crim. App. 1970)). Neither Mother's nor Father's counsel objected to the admission of the test results on the basis that the appropriate chain of custody was not established when the exhibits were introduced; on appeal, however, Father argues that "the State's chain of custody evidence on the hair follicle tests . . . was woefully deficient."[15] Father does not cite to any evidence that the chain of custody was inadequate or which would render the results unreliable and, upon our review of the affidavit of Mr. Engelhart, with the attachments, we find no abuse of the court's discretion in admitting the test results.

---

used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

[14] Rule 902(11) of the Tennessee Rules of Evidence states:

(11) Certified Records of Regularly Conducted Activity. The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by an affidavit of its custodian or other qualified person certifying that the record-
(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters;
(B) was kept in the course of the regularly conducted activity; and
(C) was made by the regularly conducted activity as a regular practice.
A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

[15] Father argues "there was no proof offered as to the collection site, Physician's Services, or their procedures other than the hearsay document(s) objected to by both parents."

## 2. Proof of Father's Knowledge of Mother's Drug Use

"A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re H.L.F.*, 297 S.W.3d at 236 (citing *In re R.C.P.*, 2004 WL 1567122, at *7). Citing to testimony from Ms. Olenick-Bordes, Ms. Leonor, and Mother that he was not present when Mother was using drugs, Father argues that the record does not establish that he failed to protect the children from abuse because "there is no proof in the record and from the testimony of witnesses that [he] kn[e]w of mother's exposure of methamphetamine to the children." Father's argument ignores evidence pertinent to this issue, specifically the testimony of Ms. Olenick-Bordes that Dylan had told Father about Mother's drug use and the testimony of Foster Mother that Alyssa told her that Father instructed her to put Mother's used needles in the sink. Father's knowing disregard for Mother's drug use around the children and his instruction to Alyssa as to how to dispose of the needles constitute severe child abuse against all the children, within the meaning of Tennessee Code Annotated section 36-1-113(g)(4). This is clear and convincing proof of Father's knowing failure to protect the children from abuse and supports termination on this ground.

### C. Persistence of Conditions

The trial court terminated Father's rights to Dylan on the ground of persistence of conditions. In its brief on appeal, the Department states that it "does not proceed on the ground of persistence of conditions regarding Dylan" and does not present argument as to this ground. In light of the Department's abandonment of this ground of termination, we reverse the judgment of the trial court terminating Father's rights to Dylan on the ground of persistence of conditions.

## IV. BEST INTEREST

Once a ground for termination has been proven, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i)[16]

---

[16] The factors at section 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

for the courts to follow in determining a child's best interest. The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). Father argues that there is not clear and convincing evidence that termination of his rights is in the best interest of the children.

In finding that termination of Father's rights was in the best interest of the children, the trial court made the following findings, which address statutory factors (1), (2), (5), and (6):

> [Father] has not made changes in his conduct or circumstances that would make it safe for the children Dylan, Sophia, or Edwin Jr. to go home;
> ***
> [Father] has not made lasting changes in his lifestyle or conduct after reasonable efforts by the State to help, so that lasting change does not appear possible;
> ***

---

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

18

> Changing caregivers at this stage of their lives will have a detrimental effect on them;
>
> ***
>
> [Father] severely abused the children by failing to protect them from methamphetamine exposure.

With respect to factor (1), Father argues that the evidence shows that he and Mother do not live together and that he has complied with some provisions of the permanency plans, demonstrating that he has made an adjustment in his circumstances. This evidence, however, does not preponderate against the court's finding, which is supported by much of the testimony discussed in section III. A., *supra*. The testimony of Ms. Leonor that Father maintained a relationship with Mother and failed to establish a safe, legal, and reliable transportation plan, the testimony of Ms. Holmes that Mother and Father arrived together for scheduled visitation, and Father's testimony about his continued contact with Mother shows that Father's relationship with Mother is ongoing and volatile at times. In addition, without a valid license or alternate transportation plan, Father is unable to safely transport the children as needed. Accordingly, the evidence supports the finding that Father has not changed his conduct or circumstances such that his home is a safe environment for the children.

With respect to factor (2), Father cites to testimony that DCS case workers only visited his home twice, made no recommendations for him to improve his home, and did not assist him with finding other dates to attend language classes and argues that DCS failed to provide reasonable efforts to help him. This evidence does not preponderate against the court's finding. In addition to the testimony referenced in the discussion of factor (1) above, Ms. Leonor testified that she reminded Father on numerous occasions that Mother could not be present in the home but that she located Mother at Father's home. Father testified about an incident in which he chased Mother with a machete a few months prior to trial and that he had paid a cash bond on her behalf two months prior to trial. Father also testified that he and Mother continued to speak on the phone nearly daily. Father testified that his immigration status prevented him from obtaining a valid driver's license; however, he failed to utilize DCS's acceptable alternative transportation plan to attend any scheduled visitations or the termination proceeding, choosing to drive himself instead. Accordingly, the evidence supports the court's finding with respect to this factor.

As to factor (5), Father contends that no testimony was elicited at trial relative to how a change in caretakers would affect the children. DCS argues that the evidence shows that a change in caretakers would have a negative effect, as the children are settled with and bonded to the foster parents and their extended family, that the foster parents wish to adopt the four children, and that the children have expressed a desire to be adopted by the foster parents. We have reviewed the evidence cited by DCS and conclude that it supports the trial court's finding. In this regard, we also note Foster

Mother's testimony that the children "usually don't want to go to the visitations" and have expressed a desire for stability.

As to factor (6), Father challenges the finding of severe child abuse; in addition, Father argues that he was not aware of Mother's drug use.[17] We have reviewed the evidence relied upon by Father as well as other testimony, including that of Ms. Olenick-Bordes that Dylan had told Father about Mother's drug use and the testimony of Foster Mother that Alyssa told her that Father instructed her to put Mother's used needles in the sink. As noted in footnote 5, *supra*, the trial court made an adverse credibility finding as to Mother pertinent to the issue of her drug use, i.e. that it "does not find great portions of [Mother]'s testimony to be credible, specifically concerning her use and purchase of drugs." Moreover, although not specifically directed to the issue of Mother's drug use, the court made several adverse credibility findings regarding Father's testimony as to his continuing relationship with Mother. Father's reliance on Mother's testimony that he did not know that she was taking drugs is misplaced. We conclude that the evidence does not preponderate against the court's finding with respect to this factor.

The evidence does not preponderate against the findings as to these factors. We proceed to address Father's argument that the court should have also made findings with respect to factors (3), (4), (7), (8), and (9), which he argues would have supported a conclusion that termination was not in the children's best interests.

With respect to factors (3), (4), and (8), Father argues that he "has maintained consistent and appropriate visitation with the children[, . . . who] are happy to see father as father is to see children"; that he is "engaged at visitations[, and the c]hildren are engaged with father"; that "[a] meaningful relationship exists between father and the children"; and that "[t]here are no mental or emotional issues past are present regarding father[, . . . who] is appropriate, attentive, and loving towards his children." DCS admits that "the witnesses testified that Father was appropriate and loving toward the children during visitation and that the children responded well to Father," but cites to other evidence to argue that "Father has not evinced a willingness to protect his children from harm." With respect to factor (7), the physical environment of Father's home, he argues that there is "no history of any criminal activity from father except for his aggravated assault charge from earlier this year[,] and it was not known where the alleged assault took place . . . [and] said aggravated assault charge against father was dismissed." As to factor (9), Father testified that he paid support, and DCS does not dispute this fact or raise an argument with respect to this factor.

---

[17] Father cites the testimony of Ms. Olenick-Bordes that the two older children "did not indicate that [Father] was present when mother allegedly used the 'rig,'" the testimony of Ms. Leonor that the children never indicated to her that Father was present when Mother used drugs, and the testimony of Mother that Father "was never present when she used drugs and never knew she was using drugs" in support of this argument.

In considering whether termination is in the child's best interest, the trial court, as well as this court, is to consider the best interest from the children's perspective, not Father's. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Moreover, we have explained:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis. *White v. Moody,* 171 S.W.3d at 194.

*In re Audrey S.*, 182 S.W. 3d at 878.

We have reviewed the evidence relied upon by Father in support of his argument and, even considering these additional factors, conclude that the combined weight of the evidence relative to all factors amounts to clear and convincing evidence that termination is in the best interest of the children. While the evidence shows that Father loves his children, interacts properly with them during visitation, and pays support, other evidence shows that Father and Mother have a continuing, volatile relationship, that the children have been exposed to Mother's drug use in Father's home, and that he has failed to protect them from that exposure. The children are currently in a stable foster home with foster parents who want to adopt them. As instructed by *In re Audrey S.*, the relevancy and weight given to the various factors "depends on the unique facts of each case." *Id.* The trial court gave careful consideration to the evidence as to the grounds of termination, much of which also pertained to the question of whether termination of Father's rights was in the children's best interest. Viewing the record as a whole from the children's perspective, the evidence clearly and convincingly establishes that termination of Father's parental rights is in the children's best interest.

## V.    CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court relating to the ground of persistence of conditions; we affirm the judgment in all other respects.

---

RICHARD H. DINKINS, JUDGE

21